# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT NASHVILLE
## July 21, 2009 Session

## RAYMOND O. LONG, JR. v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2004-B-1804      Steve Dozier, Judge**

---

**No. M2008-01820-CCA-R3-PC - Filed April 19, 2010**

---

Petitioner, Raymond Long, Jr., appeals the dismissal of his petition for post-conviction relief in which he alleged that he received ineffective assistance of counsel at trial. Specifically, Petitioner challenges trial counsel's failure to call certain witnesses to testify at trial on his behalf. After a thorough review of the record, we conclude that Petitioner has failed to show that his trial counsel rendered ineffective assistance of counsel and affirm the judgment of the post-conviction court.

**Tenn. R. App. P. Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Jeremy W. Parham, Nashville, Tennessee, for the appellant, Raymond O. Long, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn, Assistant Attorney General; Victor S. (Torry) Johnson III, District Attorney General; and Katrin Miller, Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

## I. Background

Following a jury trial, Petitioner was convicted of the second degree murder of Terrance Scruggs and the first degree premeditated murder of Falon Glaze. The trial court sentenced Petitioner to life imprisonment for his first degree murder conviction. The trial court sentenced Petitioner as a Range II, multiple offender, to thirty-two years for his second degree murder conviction, and ordered Petitioner to serve this sentence consecutively to his life sentence. Petitioner's convictions and sentences were upheld on appeal. *State v.*

*Raymond O. Long, Jr.*, No. M2005-02960-CCA-R3-CD, 2007 WL 551306 (Tenn. Crim. App., at Nashville, Feb. 23, 2007), *perm. to appeal denied* (Tenn. May 14, 2007).

The facts supporting Petitioner's convictions were summarized by this Court on appeal as follows. (Because the victim, Falon Glaze, had the same last name as Magan Glaze, one of the witnesses at trial, both women were referred to by first name only in the opinion).

Etasha Ford, Falon's cousin and good friend, testified that the defendant and Falon were in a dating relationship for approximately five years before Falon broke up with the defendant in October 2003 and started dating Mr. Scruggs. On the night of December 23, 2003, Ms. Ford was supposed to take Falon to Wal-Mart because Falon's car tires were flat. Ms. Ford called Falon at 11:30 p.m. and told Falon to be waiting for her. Mr. Scruggs was at Falon's apartment at the time. Ms. Ford arrived at Falon's apartment at midnight and "[p]olice and ambulance and fire department [were] everywhere. And ... they were bringing Terrance [Scruggs] out on a stretcher."

Ms. Ford recalled an incident in April 2003 when Falon called her frantically screaming that the defendant had just tried to kill her by running her car off the road. Ms. Ford later saw Falon's car and noted that the car looked like it had been sideswiped on the driver's side. Ms. Ford also recalled an incident that occurred about a week before Falon's death when Falon called Ms. Ford and told her that the defendant had "just tried to kill [her]. He just put a knife up to [her] neck and said that [he was] gonna kill [her], Terrance, and ... everybody that's [at her grandmother's house]." On cross-examination, Ms. Ford could not recall whether she told the officers at the scene about the two incidents involving the defendant because she was hysterical at the time. Ms. Ford admitted that she was not present when either of the alleged incidents occurred.

Officer Matthew Atnip with the Metropolitan Nashville Police Department testified that he arrived at Falon's apartment and noticed that the door had been "busted" off the jamb. Officer Atnip saw an unconscious female lying on the floor in the den and a wounded, but conscious male in the bedroom. Officer Atnip interviewed the residents of nearby apartments, but no one saw what happened.

On cross-examination, Officer Atnip noted that the female victim was lying on the floor with her feet facing the door, but she was far enough away

-2-

from the door for the door to open and close. Officer Atnip stated that the apartment door was closed when he arrived, so he had to open it before he could enter the apartment. Officer Atnip recalled that the male victim was still on the phone with 911 when he arrived, but he did not know whether anyone questioned the male victim about who had shot him. When shown a photograph of the doorway into the apartment, Officer Atnip identified a shell casing in the middle of the door frame. Officer Atnip recalled that the neighbor across the hall from Falon reported seeing or hearing "one person running down the steps." Officer Atnip stated that he was called to the scene right before midnight.

Metropolitan Nashville Police Officer Burl Eddy Johnson, Jr., testified that he received a call to report to Falon's apartment at 11:48 p.m. When he arrived, several officers were already on the scene, and he noted that the apartment door appeared to have been forced open or kicked in and pieces of the door jamb were on the living room floor. Officer Johnson identified a picture of a shell casing standing on end in the doorway, and another picture of a shell casing found outside of the apartment to the left of the doorway. Officer Johnson was sure the casings were not disturbed prior to being photographed. On cross-examination, Officer Johnson noted that when an automatic weapon is fired the shell will eject straight down or behind the shooter.

Calvin Miles testified that on December 23, 2003, the defendant and Joseph Whitfield, as well as some other friends, were at his house playing video games. The defendant arrived around 10:00 p.m. and had been drinking. Mr. Miles recalled seeing the defendant talk to Mr. Whitfield and Darian Spencer at some point that night. The defendant left around 11:00 p.m. followed by Mr. Whitfield about ten minutes later. Mr. Miles said that the defendant called around 10:00 the next morning looking for Mr. Whitfield, but he said that he did not know Mr. Whitfield's whereabouts.

Mr. Miles stated that he did not know Falon Glaze, but he knew that the defendant had a girlfriend with whom he was having problems. One time in the past, Mr. Miles witnessed a telephone argument between the defendant and Falon, but the defendant "took the conversation on the porch" because he was being loud. On cross-examination, Mr. Miles stated that he had no independent knowledge of what happened at Falon's apartment the night of December 23, 2003.

Joseph Whitfield testified that he knew the defendant for a couple of months prior to the incident in this case. Mr. Whitfield saw the defendant on December 23, 2003, at Mr. Miles' house, and the defendant "was asking everybody would we go somewhere with him." Mr. Whitfield eventually agreed to go with the defendant, but the defendant did not tell him where they were going. They left Mr. Miles' house sometime late in the evening and drove on Interstate-24 until they parked on the side of the interstate behind Murfreesboro Road. The defendant led the way through a hole in a fence, up a hill, and across a parking lot into an apartment complex.

Mr. Whitfield testified that the defendant led the way to a third-floor apartment, had Mr. Whitfield knock on the door, and when no one answered, the defendant "made his way in." Mr. Whitfield explained that the defendant broke the apartment door open with his body. Once the defendant was inside the apartment, Mr. Whitfield heard a shot, a pause, and then another shot. Mr. Whitfield remembered hearing a female yell. Mr. Whitfield took off running because he "didn't wanna be in the way of what was coming out that door." As he was running, Mr. Whitfield noticed that the defendant was not far behind him, and they left the apartment complex the same way they entered. The defendant drove Mr. Whitfield back to Mr. Miles' house.

Mr. Whitfield testified that he asked the defendant what had happened, but the defendant did not say anything. Mr. Whitfield did not see the defendant with a gun until they were running from the apartment. The next day, Mr. Whitfield and his girlfriend went to Memphis for the holidays. While in Memphis, Mr. Whitfield saw on the news that two people had been shot and killed in a Nashville apartment. Mr. Whitfield said that he did not call the police because he was scared that he might get charged along with the defendant.

Mr. Whitfield stated that Mr. Miles called him to say that the defendant was looking for him, but Mr. Miles did not give the defendant Mr. Whitfield's phone number. Mr. Whitfield was contacted by the police through his ex-girlfriend, and he gave a statement on January 30, 2004. In his first interview, Mr. Whitfield told the detective that he "didn't want no part of it." Mr. Whitfield talked to the detective again the next day and admitted that he was present, but did not tell the detective about the gun. Mr. Whitfield admitted that he testified at a hearing and did not mention seeing the defendant with a gun. Mr. Whitfield acknowledged that he had two prior felony drug convictions.

On cross-examination, Mr. Whitfield said that prior to this incident he did not hang out with the defendant. Mr. Whitfield stated that he never showed the police the hole in the fence he and the defendant went through the night of the incident. Mr. Whitfield admitted again that he initially told the police that he did not go with the defendant to Falon's apartment. Mr. Whitfield also admitted that during the second interview he did not mention seeing the defendant with a gun. Mr. Whitfield did not remember telling the police in his second interview that he went to his girlfriend's house and then met the defendant at a grocery store before heading to Falon's apartment.

When asked to recall his testimony at the preliminary hearing, Mr. Whitfield said that he was asked at what point he saw the defendant with a gun, and he responded, "[a]fter we left. After we struck out running." Mr. Whitfield was shown a transcript of his preliminary hearing testimony where he said that he never saw the defendant with a gun, even after he came out of the apartment. Mr. Whitfield admitted that he did not tell the truth during his two interviews with police or at the preliminary hearing.

Magan Glaze, Falon's sister, testified that the defendant and her sister dated for five years and then broke up in November 2003. Falon became involved with Terrance Scruggs while Falon was still dating the defendant. Magan talked to her sister on the phone between 10:30 and 11:00 p.m. the night she was killed. Magan said that while she was on the phone with her sister, she received a call from the defendant and a man named Joe who were looking for her sister. Magan recalled an incident about a week before Falon's murder when Falon showed up at her house and said that the defendant had just put a knife to her throat and threatened to kill her, her family, and her new boyfriend. On cross-examination, Magan admitted that she was not present when the defendant threatened Falon.

John Bostic testified that he lived in an apartment across the hall from Falon. Mr. Bostic noticed that Falon had a regular male visitor and then in December 2003 started having another male visitor. Mr. Bostic noted that he would still see the first male hanging around the parking lot of the apartment complex. Mr. Bostic recalled that around 11:00 p.m. on December 23, 2003, he heard a loud bang like something getting kicked in, and then a shot and muffled scream. Mr. Bostic then heard a second shot, another muffled scream, and footsteps running down the steps. On cross-examination, Mr. Bostic admitted that he never saw who was involved in the altercation across the hall.

Mr. Bostic also admitted that he told Detective Freeman that he thought he heard a car squealing as it pulled away.

Glenn Carter, owner of Carter's Family Florist, testified that the defendant ordered a half-dozen roses around Christmas 2003. The defendant told Mr. Carter that he had messed up and was trying to get his girl back. The defendant later called Mr. Carter and told him that he did not think the flowers had worked. On cross-examination, Mr. Carter acknowledged that it was not unusual for a man to send flowers to his girlfriend.

Medical Examiner, Dr. Tom Deering, testified that he performed the autopsies on the victims and determined that Falon died from a gunshot wound to the chest and Mr. Scruggs died from a gunshot wound to the back. Dr. Deering determined that Falon died within minutes of being shot, but Mr. Scruggs would have survived longer. On cross-examination, Dr. Deering stated that he could not determine which victim was shot first, nor could he determine how close the shooter was to either victim.

Metropolitan Nashville Police Detective Charles Freeman testified that Falon's family pointed to the defendant as a suspect from the beginning. On December 24, 2003, Detective Freeman went to the defendant's house and asked him to come to the police station. The defendant told Detective Freeman that the previous night he had been in class until 8:00 p.m. and rode the bus home where he was the rest of the night. Later, the defendant told Detective Freeman that he had actually received a ride home from a girl in another class. When asked a third time, the defendant said that he had driven home from class but did not want to tell because he was not supposed to be driving. Detective Freeman recalled that he received information from a Mr. Grimes that caused him to question the defendant again. This time the defendant stated that he went to Mr. Grimes' house around 12:30 a.m. the morning of December 24th, and then Mr. Grimes gave him a ride home.

Detective Freeman testified that he received information from Mr. Whitfield about how he and the defendant got into the apartment complex, and he located and videotaped the path they had taken. Detective Freeman noted that there was a hole in the fence through which one could enter into the apartment complex. Detective Freeman said that he never located any suspects other than the defendant.

On cross-examination, Detective Freeman stated that he never asked Mr. Whitfield to accompany him to the scene of the crime and show him the route they took that night. Detective Freeman also stated that he went to the scene and looked for the hole in the fence shortly after interviewing Mr. Whitfield, but was unable to locate the hole. Detective Freeman said that he was able to find the hole in the fence in September 2005 when he went to make the videotape. Detective Freeman admitted that no physical evidence was collected that would place the defendant at the scene of the shootings. Detective Freeman acknowledged that if a person went into an apartment, closed the door, and fired a pistol, the shell casings would not have been outside the door and in the door frame.

*Raymond O. Long, Jr.*, 2007 WL 551306, at *1-5.

## II. Post-Conviction Hearing

Petitioner's trial counsel testified that he met with Petitioner at least twelve times prior to trial. Trial counsel stated that he discussed a potential alibi defense with both Petitioner and his mother, Carolyn Long. Trial counsel said that he did not recollect either Petitioner or Ms. Long telling him that Petitioner was at home with his parents on the night of the murders. If Petitioner had told him that and the alibi could have been verified, trial counsel stated that he would have submitted the evidence. However, the information provided by Petitioner during these pre-trial discussions about his activities on December 23, 2003, was difficult to reconcile with the evidence the State would present during its case-in-chief. Trial counsel stated, "[I]t did not seem like something that I could put before the Court."

Trial counsel acknowledged that there was no physical evidence linking Petitioner with the commission of the offenses. Trial counsel said that he was aware before trial that the murder weapon had been found in the possession of Terrio Williams approximately nine months after the commission of the offenses. Trial counsel said that he made several attempts to interview Mr. Williams, but Mr. Williams refused to talk to him. Trial counsel stated, "[I] did not want to put somebody on the stand that I didn't know what he was going to say." Trial counsel believed, however, that Mr. Williams' possession of the murder weapon was brought out during the cross-examination of one of the State's witnesses. Trial counsel acknowledged that he did not attempt to interview Anne Michelle Williams who was with Mr. Williams when Mr. Williams was arrested because she was not charged with any crime.

On cross-examination, trial counsel stated that he had been a police officer for sixteen years prior to obtaining his law degree. Trial counsel said that at the time of Petitioner's trial,

he had been practicing law for approximately ten years in the field of criminal law. Trial counsel reiterated that he investigated Petitioner's alibi evidence and believed that presentation of the evidence would not be beneficial to Petitioner.

Petitioner testified that he met with trial counsel between three and six times prior to trial. Petitioner said that he learned about Ms. Glaze's death from his mother the day after the murders. Petitioner stated that on December 23, 2003, he attended a drug class from 6:00 p.m. until 8:00 p.m., and then returned home because the terms of his probation imposed an 8:00 p.m. curfew. Petitioner said that he did not leave his parent's house again until approximately 8:00 a.m. the following day when he went to Mr. Grimes' house. Petitioner denied that he told the investigating officers that he went to a party at Mr. Grimes' house at approximately 12:30 a.m. on December 24, 2003, and insisted that other aspects of his written statement were inaccurate as well.

Petitioner contended that trial counsel's assistance was deficient because he did not challenge Detective Freeman's testimony on direct examination that there were no other suspects in the case. Petitioner submitted that Mr. Williams' possession of the murder weapon clearly made him a suspect in the case. Petitioner stated that trial counsel refused to call his alibi witnesses because trial counsel believed the State's case was "weak."

Carolyn Long, Petitioner's mother, testified that she arrived home on December 23, 2003, at approximately 5:00 p.m., and Petitioner arrived home at approximately 8:00 p.m. Ms. Long stated that Petitioner helped her set up a Play Station II at approximately 11:00 p.m. Ms. Long then went to bed around 11:40 p.m. Ms. Long heard Petitioner coughing about ten minutes later, and then she fell asleep again. Ms. Long stated that it took between twenty and twenty-five minutes to drive from her house to Ms. Glaze's apartment.

Raymond Long, Sr., Petitioner's father, testified that Petitioner arrived home on December 23, 2003, at approximately 8:00 p.m. Mr. Long said that Petitioner helped him fix a television set until approximately 10:30 p.m. Mr. Long stated that the evening news was just concluding when he turned the television set on. Mr. Long fell asleep around 11:00 p.m. Mr. Long said that he did not hear any noises in the house after that time.

## III. Standard of Review

A petitioner seeking post-conviction relief must establish his allegations by clear and convincing evidence. T.C.A. § 40-30-210(f). A claim of ineffective assistance of counsel is a mixed question of law and fact. *See State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved

by the post-conviction court as the trier of fact. *See Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, we accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). However, we will review the post-conviction court's conclusions of law purely de novo. *Id*.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he must establish that counsel's performance fell below the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). In addition, he must show that counsel's ineffective performance actually adversely impacted his defense. *Strickland v. Washington*, 466 U.S. 668, 693, 104 S. Ct. 2052, 2067 (1984). In reviewing counsel's performance, the distortions of hindsight must be avoided, and this Court will not second-guess counsel's decisions regarding trial strategies and tactics. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). The reviewing court, therefore, should not conclude that a particular act or omission by counsel is unreasonable merely because the strategy was unsuccessful. *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. Rather, counsel's alleged errors should be judged from counsel's perspective at the point of time they were made in light of all the facts and circumstances at that time. *Id*. at 690, 104 S. Ct. at 2066.

A petitioner must satisfy both prongs of the *Strickland* test before he or she may prevail on a claim of ineffective assistance of counsel. *See Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997). That is, a petitioner must not only show that his counsel's performance fell below acceptable standards, but that such performance was prejudicial to the petitioner. *Id*. Failure to satisfy either prong will result in the denial of relief. *Id*. Accordingly, this Court need not address one of the components if the petitioner fails to establish the other. *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069.

## IV. Failure to Call Witnesses at Trial

### A. Terrio Williams and Anne Michele Williams

Petitioner argues that trial counsel's assistance was ineffective because he failed to call these witnesses to testify at trial. Petitioner submits that there was no physical evidence placing him in the victim's apartment at the time of the murders, and Mr. Williams' possession of the murder weapon after the commission of the offenses made him a suspect in the case.

Approximately nine months after the commission of the offenses, a search warrant, arising out of an unrelated matter, was executed on Mr. Williams' vehicle. During the search, a gun was found, and Mr. Williams was charged with possession of a weapon by a convicted felon. Subsequent testing revealed that the gun found in Mr. Williams' vehicle

was the gun used to commit the murders of Ms. Glaze and Mr. Scruggs. Ms. Williams, who was with Mr. Williams when the vehicle was searched, was not charged with any offense. Trial counsel testified that he was aware of this information prior to trial. He attempted to interview Mr. Williams' on several occasions, but Mr. Williams refused to talk to him. Trial counsel, therefore, decided not to call Mr. Williams as a witness because he did not know what Mr. Williams would say at trial. Trial counsel stated that he did not interview Ms. Williams because she was not charged with any offense.

Although trial counsel testified at the post-conviction hearing that he believed that he had brought out the circumstances surrounding the discovery of the murder weapon at trial, the post-conviction court noted that its review of the record revealed that the issue was not raised at trial during the cross-examination of the State's witnesses. Nonetheless, the post-conviction court found that Petitioner had failed to show that he was prejudiced by trial counsel's decision not to call Mr. Williams as a defense witness at trial.

"Defense counsel must investigate all apparently substantial defenses available to the defendant and must assert them in a proper and timely manner." *Baxter*, 523 S.W.3d at 935. "And if counsel's choices not to raise substantial defenses are professionally unreasonable 'considering all the circumstances,' counsel's performance is deficient." *Pylant v. State*, 263 S.W.3d 854, 868 (Tenn. 2008) (citing *Strickland*, 466 U.S. at 688, 104 S. Ct. 2052). In the instant case, trial counsel attempted to interview Mr. Williams, but Mr. Williams refused to talk to him. Without knowing what Mr. Williams would have disclosed at trial, trial counsel made a strategic decision not to call him to testify, which decision, under the circumstances presented, did not fall below the standard of reasonableness demanded of defense counsel.

Nonetheless, even if trial counsel's assistance in this regard was deficient, Petitioner did not call either Terrio Williams or Anne Michele Williams to testify at the post-conviction hearing. Whether their testimony would have been favorable to Petitioner, therefore, is merely speculation. Although Petitioner insists that Mr. Williams' possession of the weapon made him a viable suspect, it is just as possible that exploring the weapon's chain of custody might have led back to Petitioner. As for Ms. Williams, without her testimony at the post-conviction hearing, Petitioner has failed to show that she had any relevant evidence concerning the gun or that she even knew anything about the weapon.

"To succeed on a claim of ineffective assistance of counsel for failure to call a witness at trial, a post-conviction petitioner should present that witness at the post-conviction hearing." *Pylant*, 263 S.W.3d at 869 (citing *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990)). "As a general rule, this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner." *Black*, 794

S.W.2d at 757); *William R. Stevens v. State*, No. M2005-00096-CCA-R3-PD, 2006 WL 3831264, at *28 (Tenn. Crim. App., at Nashville, Dec. 29, 2006), *perm. to appeal denied* (Tenn. May 21, 2007).

Petitioner also challenges trial counsel's failure to cross-examine Detective Freeman at trial about the circumstances surrounding the discovery of the murder weapon. The extent of either trial counsel's or the State's investigation of Mr. Williams was not developed at the post-conviction hearing. The record, however, contains a brief exchange of e-mails between the prosecutor and Petitioner's first appointed counsel which were attached to Petitioner's post-conviction petition as an exhibit. The e-mails indicate that Detective Freeman interviewed Mr. Williams who stated that Sergio Aquila put the gun in Mr. Williams' vehicle, and that Mr. Aquila denied doing so. Based on this information, the State informed Petitioner's counsel that it did not intend calling Mr. Williams as a witness. Petitioner, however, did not call Detective Freeman as a witness at the post-conviction hearing to demonstrate whether any further delving into the chain of custody of the murder weapon would have produced evidence favorable to Petitioner. *See Black*, 794 S.W.2d at 757.

Based on our review, we conclude that even if trial counsel's assistance in regard to Mr. Williams' possession of the murder weapon some nine months after the murders was deficient, the evidence does not preponderate against the post-conviction court's finding that Petitioner has failed to establish prejudice. Accordingly, Petitioner is not entitled to relief on this issue.

### B. Carolyn Long and Raymond Long, Sr.

Petitioner argues that trial counsel's assistance was ineffective because he failed to call his parents to testify at trial as alibi witnesses. Petitioner submits that the importance of this testimony is increased by the fact that only Mr. Whitfield's testimony placed him at the scene of the crimes.

"When a petitioner presents at the post-conviction hearing a witness he claims should have been called at trial, the post-conviction court must determine whether the testimony would have been (1) admissible at trial and (2) material to the defense." *Pylant*, 263 S.W.3d at 869 (citations omitted). Ms. Long's and Mr. Long's post-conviction testimony that Petitioner was at home with them at the time of the commission of the offenses would have been both admissible and material at trial. However, in addition to admissibility and materiality, the post-conviction court must also assess the witnesses' credibility when reviewing counsel's decision not to present the proffered testimony under an ineffective assistance of counsel challenge. *Id*. at 869-70 (citations omitted); *Vaughn v. State*, 202 S.W.3d 106, 123 (Tenn. 2006).

At the post-conviction hearing, trial counsel testified that he had several discussions with Petitioner and Ms. Long concerning a possible alibi offense. Trial counsel did not recollect either Ms. Long or Petitioner telling him that Petitioner was at home from 8:00 p.m. until nearly midnight on December 23, 2003. Trial counsel explored an alibi defense but ultimately concluded that he did not possess credible evidence to present to the jury concerning Petitioner's whereabouts on the night of the murders. The post-conviction court found:

> it [is] highly suspect and nearly implausible that a criminal defense attorney with ten years trial experience when presented with a credible alibi would choose not to present it at trial. Rather, more likely as the petitioner said in his statement to the police, he had left the apartment in the early morning hours of the incident. Additionally, two independent witnesses placed the petitioner at a party, leaving and going with one of those witnesses to the scene of the homicides. The Court accredits the testimony of trial counsel that he was not presented with credible alibi witnesses and the alibi did not fit the time line of other evidence.

"Great weight is given to a trial court's assessment of credibility." *Vaughan*, 202 S.W.3d at 123 (citing *Burns*, 6 S.W.3d at 461). Based on our review, we conclude that the evidence does not preponderate against the post-conviction court's finding that Petitioner failed to prove by clear and convincing evidence that trial counsel's assistance in this regard was deficient. Petitioner is not entitled to relief on this issue.

## V. Cumulative Effect of Errors

Petitioner argues that the cumulative effect of the errors raised in his appeal "is sufficient to warrant a new trial, even if any of these errors, standing alone, would be insufficient grounds for a new trial." However, because we conclude that Petitioner has failed to establish that his trial counsel's assistance was deficient or that he was prejudiced by trial counsel's assistance, Petitioner is not entitled to relief on this issue.

## CONCLUSION

After a thorough review, we affirm the judgment of the post-conviction court.

_____
THOMAS T. WOODALL, JUDGE